[No. H006506. Sixth Dist. Oct. 5, 1992.]

RESOLUTION TRUST CORPORATION, as Receiver, etc., Plaintiff, Cross-defendant and Appellant, v.
WILLIAM WINSLOW, Defendant, Cross-complainant and Appellant; JESS RODRIGUES, Cross-defendant and Respondent.

1800

**COUNSEL**

Berliner, Cohen & Biagini, Frank R. Ubhaus, Russell J. Hanlon and Thomas P. Murphy for Plaintiff, Cross-defendant and Appellant.

John H. Patton for Defendant, Cross-complainant and Appellant.

Jess Rodrigues, in pro. per., for Cross-defendant and Respondent.

**OPINION**

**CAPACCIOLI, Acting P. J.**—Judgment was entered for plaintiffs on their complaint and for defendant Winslow on his cross-complaint. Resolution Trust Corporation (hereafter RTC) was subsequently appointed conservator for Saratoga Savings & Loan Association (hereafter Association). Notice of appeal by plaintiffs from the judgment was timely filed. RTC thereafter substituted in as a party. On appeal, RTC asserts, for the first time, that federal statutory and common law bars Winslow from recovering from the RTC for misrepresentations made by Association and its subsidiary, Saratoga Service Corporation (hereafter Saratoga). In his cross-appeal, Winslow asserts that the trial court erroneously granted specific performance to plaintiffs. For the reasons expressed below, we reverse the judgments.

### FACTS

On June 4, 1985, Saratoga sued Winslow and Optcenters, Inc., seeking dissolution of Optcenters, appointment of a receiver, specific performance, damages and an accounting. Saratoga filed an amended complaint on August 11, 1988. The complaint was based on an agreement between Winslow and Saratoga which provided that Saratoga would invest $300,000 in Optcenters, Inc. Optcenters would then issue 30,000 shares of stock each to Saratoga and Winslow. "As part of the consideration for SSC [Saratoga] providing all of

the capital for the start-up of the Corporation, as herein set forth, and as further security for the preservation of a portion of the capital provided by SSC as set forth herein, Winslow hereby assigns to SSC, including voting rights, as security for the return of $150,000 of SSC's investment, 100% of the issued and outstanding capital stock of Winslow Research Institute and 100% of the issued and outstanding capital stock of Institute of Athletic Motivation. These assignments shall be released by SSC to Winslow when the total stockholders' equity of the Corporation reaches $300,000, or in the event of dissolution, where SSC has received at least $150,000 in assets, or in such dissolution upon payment by Winslow to SSC of a sum, when combined with any dissolution of assets, distributed to SSC, equals $150,000."

On June 16, 1986, Winslow and Optcenters filed a cross-complaint for fraud, misrepresentation, breach of contract and other related causes of action against Saratoga, Association, Saratoga employee Jess Rodrigues and others. The cross-complaint alleged that "it was *understood, implied and agreed orally* between cross-defendants and cross-complainant Winslow that the initial investment by cross-defendants was only the minimum amount of funding that was to be provided by cross-defendants for the business of Optcenters, and that additional monies would be loaned to Optcenters by cross-defendants over and above $315,000, as said funds became reasonably necessary for operation of the business . . . ." (Italics added.) Winslow's misrepresentation causes of action were based on oral agreements and misrepresentations.

Association filed a cross-complaint against Winslow for fraud based on allegations that Winslow had misrepresented his qualifications.

Trial commenced on April 12, 1989. The equitable issues were tried to the court. On Saratoga's complaint, the court found Winslow liable for breach of contract and ordered specific performance. Winslow was ordered to *convey* the stock specified in the agreement to Saratoga or pay Saratoga $150,000. On Winslow's cross-complaint, the jury returned special verdicts with respect to liability. They found that Jess Rodrigues, Association and Saratoga had not intentionally defrauded Winslow but that Association and Saratoga were liable for negligent misrepresentations made to Winslow upon which he had relied. On June 28, 1989, the jury returned a general verdict setting damages on Winslow's cross-complaint at $415,000. On Association's cross-complaint, the jury returned a special verdict in which they found that Winslow was not liable to Association for fraud.

Judgment was entered on August 22, 1989. Notice of entry of judgment was filed on September 11, 1989. Plaintiffs moved for a new trial and for

judgment notwithstanding the verdict asserting that the evidence was insufficient and the damages excessive. On November 6, 1989, the motions were denied. On December 4, 1989, Saratoga and Association appealed from the judgment on the cross-complaint.[1] On December 19, 1989, Winslow filed a cross-appeal from the judgment of specific performance.

Sometime between November 8, 1989, and December 8, 1989, RTC was appointed as conservator for Association pursuant to 12 United States Code section 1464.[2] On May 24, 1990, RTC was appointed as receiver for Association pursuant to section 1464 for the purpose of liquidation. On June 27, 1991, RTC obtained an order from the trial court substituting itself as a party to the action in place of Saratoga and Association. On July 8, 1991, pursuant to rule 48(a) of the California Rules of Court, we ordered that RTC be substituted in place of Saratoga and Association as appellant in this action. RTC filed its opening brief on July 18, 1991.

DISCUSSION

### A. D'Oench, Duhme and Section 1823, Subdivision (e)

Because the application of the "*D'Oench, Duhme* doctrine" determines the fate of this appeal, an introduction to this doctrine and its statutory counterpart is necessary. In 1942 the United States Supreme Court established the "*D'Oench, Duhme* doctrine" in *D'Oench, Duhme & Co.* v. *F.D.I.C.* (1942) 315 U.S. 447 [86 L.Ed. 956, 62 S.Ct. 676] (hereafter referred to as *D'Oench*). In *D'Oench*, the Federal Deposit Insurance Corporation (FDIC) sued on a note after it took over a bank. As a defense, the obligor asserted that he was not liable on the note due to a side agreement which did not appear in the records of the failed bank. Drawing on congressional intent expressed in federal "holder in due course" laws, the Supreme Court held that there was "a federal policy to protect [the FDIC], and the public funds which it administers, against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures or to which it makes loans." (*Id.* at p. 457 [86 L.Ed. at p. 962].) " 'Public policy requires that a person who, for the accommodation of the bank[,] executes an instrument which is in form a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced.' " (*Id.* at p. 459 [86 L.Ed at p. 963], quoting *Mount Vernon Trust Co.* v. *Bergoff* (1936) 272 N.Y. 192 [5 N.E.2d 196, 197].)

[1]Resolution Trust Corporation, as conservator for Association, was listed as a cross-defendant on the notice of appeal but since it was not a party to the action at the time of the appeal, this notation is of no moment.

[2]All statutory references are to title 12 of the United States Code unless otherwise specified.

Barring the assertion of the unrecorded agreement was not inequitable to the obligor because he had "lent himself to a scheme or arrangement whereby the banking authority on which [the FDIC] relied in insuring the bank was or was likely to be misled." (*D'Oench, Duhme & Co.* v. *F.D.I.C., supra,* 315 U.S. at p. 460 [86 L.Ed. at pp. 963-964].)

Justice Jackson, in a concurrence, noted that the matter was not a diversity case but was instead a federal question case. (315 U.S. at p. 467 [86 L.Ed at pp. 966-967].)[3] Although no federal statute was directly applicable, Justice Jackson opined that federal law could be derived from sources other than statutes. "The federal courts have no *general* common law . . . [b]ut this is not to say that wherever we have occasion to decide a federal question which cannot be answered from federal statutes alone we may not resort to all of the source materials of the common law, or that when we have fashioned an answer it does not become a part of the federal non-statutory or common law." (*Id.* at p. 469 [86 L.Ed. at p. 968], italics in original.)

Congress thereafter partially codified the *D'Oench* doctrine by enacting section 1823(e). "No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—[¶] (1) is in writing, [¶] (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution, [¶] (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and [¶] (4) has been, continuously, from the time of its execution, an official record of the depository institution." (§ 1823(e).)

Over the years, the federal common law *D'Oench* doctrine has been expanded to apply to the Federal Savings and Loan Insurance Corporation (FSLIC) and other federal financial entities, in addition to the FDIC; but section 1823(e), the statutory *D'Oench* doctrine, had, until recently, remained limited to the FDIC acting in its corporate capacity. In 1989, a comprehensive package of statutory revisions extended the protection offered by section 1823(e), to the RTC acting in its corporate or receivership capacity. (*Adams* v. *Madison Realty & Development, Inc.* (3d Cir. 1991) 937 F.2d 845, 854.) "[T]he [Resolution Trust] Corporation [when acting as a

---

[3]He based this conclusion on a federal statute which provided that, with certain exceptions, suits in which the FDIC was a party arose under federal law. (*Id.* at pp. 467-468, fn. 4 [86 L.Ed. at p. 967].)

conservator or receiver] shall have the same powers and rights to carry out its duties with respect to [depository] institutions . . . as the Federal Deposit Insurance Corporation has under sections [1821, 1822 and 1823]." (§ 1441a(b)(4).)

Although the reach of both the common law and statutory doctrines has been extended, the policy behind them has remained the same. "The policy of *D'Oench* is to retain public confidence in the banking system and to minimize the loss to the depositors and the FDIC when a banking institution fails. Secret agreements between banks and their customers cannot be recognized if this goal is to be achieved." (*Federal Deposit Ins. Corp.* v. *Dureau* (1989) 212 Cal.App.3d 956, 965 [261 Cal.Rptr. 19].)

## B. *RTC's Appeal*

RTC asserts that the application of section 1823, the statutory *D'Oench* doctrine, and the federal common law *D'Oench* doctrine requires reversal of the judgment in favor of Winslow and entry of judgment for RTC on the cross-complaint. Winslow makes numerous arguments against the application of the two *D'Oench* doctrines. He asserts, among other things, that these federal doctrines are inapplicable in a state action, cannot be applied after judgment and cannot be applied here because there is insufficient evidence to support their application.

### 1. *Federal Doctrines Are Applicable*

Because his action was brought entirely under state law, Winslow argues that federal common law and statutory doctrines are inapplicable. "Even if state law governs the basic elements of the plaintiff's case in an action . . . it does not follow that every issue in the case . . . is governed by state law." (*Farmland Irrigation Co.* v. *Dopplmaier* (1957) 48 Cal.2d 208, 219 [308 P.2d 732, 66 A.L.R.2d 590].) If the policy of a federal statute so requires, state law must give way. (*Ibid.*) Although Winslow's cause of action for misrepresentation was based entirely on state law, the involvement of the RTC imports a federal issue into the case which requires the application of federal law.

Contrary to Winslow's assertions, Congress has provided that all actions involving the RTC arise under federal law, whatever the nature of the institution the RTC has taken over. "Notwithstanding any other provision of law, any civil action, suit, or proceedings to which the [RTC] is a party shall be deemed to arise under the laws of the United States . . ." (§ 1441a(*l*)(1).) While section 1441a is a jurisdictional statute, it also implies that Congress intended federal law to govern actions involving the RTC.

■ Congress has the power to incorporate instrumentalities such as financial entities. (*McCulloch* v. *Maryland* (1819) 17 U.S. (4 Wheat.) 316, 425 [4 L.Ed. 579, 606].) The RTC is a financial entity which is an instrumentality of the United States Government. (§ 1441a(b)(1) and (b)(2).) The power to create such an entity implies the power to preserve it. (17 U.S. at p. 426 [4 L.Ed. at p. 606].) The Constitution does not permit individual states to threaten the preservation of a federally created entity. (*Id.* at pp. 426-427 [4 L.Ed. at pp. 606-607].) "[T]he States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared." (*Id.* at p. 436 [4 L.Ed. at p. 609].)

■ Section 1441a(*l*)(1), *McCulloch* and the United States Constitution's supremacy clause demonstrate that federal law is supreme with respect to the imposition of liability on the RTC. Once the RTC became a party to this action, the matter ceased to be governed entirely by state law and became an action which was, insofar as the rights and obligations of the RTC are concerned, under the laws of the United States. (§ 1441a(*l*)(1); *McCulloch*, *supra*, 17 U.S. 316.) Congress may constitutionally prohibit states from burdening the RTC with judgments where federal policy so requires.

■ Winslow points out that, while federal statutes are supreme over state laws, no such provision appears in the Constitution which can be construed to apply to federal common law. He relies upon *Erie R. Co.* v. *Tompkins* (1938) 304 U.S. 64 [82 L.Ed. 1188, 58 S.Ct. 817, 114 A.L.R. 1487]. "Except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State. And whether the law of the State shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern. There is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a State whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts. And no clause in the Constitution purports to confer such a power upon the federal courts." (*Erie R. Co.* v. *Tompkins*, *supra*, 304 U.S. at p. 78 [82 L.Ed. at p. 1194].) Attractive as Winslow's argument may appear, however, it has no application to this case. "[T]he absence of any specific statutory provision governing the issue does not in itself mean that federal law does not control, for if the policy of the federal statute or the implications of the federal system require a uniform rule of decision, the federal courts have paramount power to fashion such a rule. [Citations.] [¶] On the other hand, the existence of a line of federal cases establishing a rule . . . is no indication of a federal policy

excluding state law." (*Farmland Irrigation Co.* v. *Dopplmaier, supra,* 48 Cal.2d at p. 219.)

While state law governs the elements of Winslow's cause of action for misrepresentation, the issue of the application of federal *D'Oench, Duhme* doctrines to this matter is governed by federal law. The federal statutory scheme, as set forth in title 12, has as its paramount concern the financial health of the nation's financial institutions and, specifically, the preservation of the federal entities which have been created to safeguard the assets of troubled institutions. These laws establish a federal policy that the responsibility of these federal entities shall not extend to agreements which are not positively reflected in a financial institution's records. This policy is supreme over state law both because it is indispensable to the achievement of the underlying federal goal of preventing a national financial collapse and because it involves, as a party, an entity created and financed by the federal government. Thus, notwithstanding *Erie,* federal statutory *and common law* is supreme in this case. A federal entity which Congress has created is involved, a strong federal policy requires the application of federal law to protect this federal entity, and Congress has expressed its desire to protect the RTC by providing that actions involving that entity shall arise under federal law.

### 2. *D'Oench Can Be Initially Raised on Appeal*

Winslow objects to appellate consideration and application of *D'Oench* and section 1823(e), claiming that postjudgment application of these doctrines is unconstitutional and against public policy. "Although ordinarily a party may not deprive his opponent of an opportunity to meet an issue in the trial court by changing his theory on appeal, this rule does not apply when, as in this case, the facts are not disputed and the party merely raises a new question of law." (*Burdette* v. *Rollefson Construction Co.* (1959) 52 Cal.2d 720, 725-726 [344 P.2d 307]; accord *Hale* v. *Morgan* (1978) 22 Cal.3d 388, 394 [149 Cal.Rptr. 375, 584 P.2d 512].)

#### a. *Undisputed Facts Support Application of D'Oench*

Winslow argues that the facts relevant to application of *D'Oench* and section 1823(e) are disputed. We disagree. Allegations based on "unwritten statements leading to claims of fraudulent inducement or failure of consideration are now also generally precluded by *D'Oench* and its progeny. . . . The evil to be prevented in any of these situations is precisely the same: the private party seeks to rely upon unrecorded promises or schemes that purport to impose obligations other than those appearing in the bank's

records upon the financial institution." (*Federal Deposit Ins. Corp. v. Mc-Cullough* (11th Cir. 1990) 911 F.2d 593, 600.) There are only two situations where *D'Oench* does not bar a claim or defense: (1) if the obligation which is the basis for a claim by a private party is clearly evidenced in a writing found in the bank's records; (2) if the note which the federal entity seeks to enforce is entirely void due to fraud in the factum. (*Baumann v. Savers Federal Sav. & Loan Assoc.* (11th Cir. 1991) 934 F.2d 1506, 1515-1516.)

The only writing which Winslow alleged supported his claims was the contract between him and Saratoga. This contract was found valid but does not contain the representation that formed the basis of the jury's verdict for Winslow. Winslow's misrepresentation claims were predicated solely on *oral representations*. The jury, by special verdict, rejected any contractual basis for Winslow's claims and held Saratoga and Association liable only for negligent misrepresentation. These oral misrepresentations cannot, under section 1823(e), form the basis for a claim or defense against the RTC. Section 1823(e) requires a contemporaneous written record of the obligation which is the basis for the claim. The only claim upon which Winslow prevailed lacked any such foundation. Hence, the facts supporting application of *D'Oench* were evident even on the face of the pleadings.

### b. *Public Policy Supports Appellate Application of D'Oench*

■ "There are many situations where appellate courts will consider [matters raised for the first time on appeal]. They will often be considered where the issue relates to questions of law only. [Citations.] Appellate courts are more inclined to consider such tardily raised legal issues where the public interest or public policy is involved. [Citations.] And whether the rule shall be applied is largely a question of the appellate court's discretion." (*Bayside Timber Co. v. Board of Supervisors* (1971) 20 Cal.App.3d 1, 5 [97 Cal.Rptr. 431]; accord *Sea & Sage Audobon Society, Inc. v. Planning Com.* (1983) 34 Cal.3d 412, 417 [194 Cal.Rptr. 357, 668 P.2d 664].)

■ The federal *D'Oench* doctrines implement important federal public policy and their application is of great public interest due to federal involvement in the ongoing upheaval being experienced by federally insured financial institutions. The facts relevant to the application of the *D'Oench* doctrines herein are not, as we have discussed, subject to dispute. The effect of applying the *D'Oench* doctrines is, therefore, purely a question of law. There is little substance to Winslow's claim that public policy militates in his favor because he had already obtained a judgment. His judgment never became final since it was timely appealed and has since then been before this court. We will therefore exercise our discretion and consider whether *D'Oench*

eliminates the basis for Winslow's judgment. Far from barring consideration of this issue, public policy demands application of *D'Oench.*

Winslow's claim that such an application is unconstitutional lacks merit. Consideration of RTC's *D'Oench* defense for the first time on appeal does not violate due process, separation of powers or the principles of comity. As noted above, Congress may constitutionally protect federally created entities from liability. The national interest underlying the federal laws that protect the RTC far outweighs Winslow's interest in holding the RTC liable for negligent misrepresentations made by employees of the failed thrift. Winslow could have required Saratoga to put its representations in writing and place them in Association's records but failed to do so. Because of Winslow's failure to protect his own interests, *D'Oench* can be applied to protect the RTC from liability on Winslow's claims.

### 3. *RTC Is Not Liable for Misrepresentations*

■ Winslow urges us to find that *D'Oench* and section 1823(e) are inapplicable because both doctrines apply to "agreements" and what is at issue here is a "judgment." Winslow's attempted distinction is without any basis. He has not obtained a final nonappealable judgment, and we have decided to consider this legal issue even though it was not raised in the trial court. Reversal of a judgment on appeal is undeniably proper where the judgment fails to survive a legal challenge. It is the basis of Winslow's claim which is barred by *D'Oench.* Ample precedent exists for applying *D'Oench* and section 1823(e) to invalidate the basis of claims such as Winslow's.

In *Langley* v. *FDIC* (1987) 484 U.S. 86 [98 L.Ed.2d 340, 108 S.Ct. 396], the United States Supreme Court held that *D'Oench* barred the Langleys' claim that the note sued upon by the FDIC was procured by fraud in the inducement. The Langleys bought some land and the bank financed the purchase. The bank made false representations relevant to the value of the land. (*Id.* at p. 89 [98 L.Ed.2d at pp. 345-346].) The bank subsequently sued on the note and the Langleys asserted that the notes had been procured by misrepresentations. (*Ibid.*) The United States Supreme Court held that the *D'Oench* bar on claims and defenses based on unrecorded side agreements extended to claims and defenses based on unrecorded fraudulent non-promissory assertions of fact. (*Id.* at pp. 91-96 [98 L.Ed.2d at pp. 346-350].) *D'Oench* was not limited to unrecorded bilateral contracts but encompassed claims and defenses based on fraud. Hence, the Langleys' fraudulent inducement defense was barred by *D'Oench.* (*Ibid.*)

*D'Oench* has also been extended to bar affirmative claims for relief. "The doctrine applies, for example, not only to defensive use of alleged oral

promises (such as in the original *D'Oench Duhme* case), but also to offensive use, such as fraud or breach of contract claims based upon alleged oral agreements." (*Walsh* v. *New West Federal Savings & Loan Assn.* (1991) 234 Cal.App.3d 1539, 1544 [1 Cal.Rptr.2d 35].) "[T]he *D'Oench, Duhme* rule bars affirmative claims based upon unrecorded agreements to extend future loans." (*Bell & Murphy & Assoc.* v. *Interfirst Bank Gateway* (5th Cir. 1990) 894 F.2d 750, 753; accord *Federal Deposit Ins. Corp.* v. *Lattimore Land Corp.* (5th Cir. 1981) 656 F.2d 139, 141-142.) *D'Oench* also bars claims based on misrepresentations. (*Bartram* v. *Federal Deposit Ins. Corp.* (1991) 235 Cal.App.3d 1749, 1753 [1 Cal.Rptr.2d 6146].) "Simply stated, the [plaintiffs] should have insisted the bank's representation . . . be put in writing as part of the bank's records. Having failed to do that, they can neither seek to enforce this oral agreement nor ask for compensation because of it. And this is true whether the complaint is framed in tort or contract, whether asserted affirmatively or as a defense . . . . The *D'Oench* doctrine bars their claim." (*Bartram* v. *Federal Deposit Ins. Corp., supra*, 235 Cal.App.3d at pp. 1757-1758; accord *Bell & Murphy & Assoc., supra*, at p. 754.)

The justification for permitting *D'Oench* to be used as a defense to affirmative claims is elementary. " 'If . . . *D'Oench* did not apply to bar the introduction of evidence of a side agreement in a claim against FDIC (or FSLIC [or the RTC]), then an obligor could circumvent the sound policy behind *D'Oench* by asserting as a counterclaim that which could not be asserted as an affirmative defense. . . . [¶] . . . [Thus e]xaminers for FSLIC could easily have over-estimated the value of the loan agreement [or property] on the books because of the alleged unevidenced [agreement to develop the property] . . . . The *D'Oench* doctrine is intended to avoid exactly this sort of potential confusion.' " (*Bartram* v. *Federal Deposit Ins. Corp., supra*, 235 Cal.App.3d at p. 1754, quoting *Hall* v. *Federal Deposit Ins. Corp.* (6th Cir. 1990) 920 F.2d 334. 340.)

Winslow's judgment was based on an oral representation—a cause of action barred by *D'Oench*. A judgment based on a cause of action barred by *D'Oench* must be reversed. Where, as here, the facts supporting the application of *D'Oench* are undisputed, the appellate court should order the trial court to enter judgment for the federal entity. We will so order. Because we reverse based on *D'Oench*, we need not address RTC's contention that there was insufficient evidence to support the verdict.

### C.  *Winslow's Cross-appeal*

■  Winslow challenges the specific performance decree issued by the trial court. The agreement between Winslow and Saratoga was a security

agreement. "Winslow hereby assigns to SSC, including voting rights, as security for the return of $150,000 of SSC's investment, 100% of the issued and outstanding capital stock of Winslow Research Institute and 100% of the issued and outstanding capital stock of Institute of Athletic Motivation. These assignments shall be released by SSC to Winslow when the total stockholders' equity of the Corporation reaches $300,000, or in the event of dissolution, where SSC has received at least $150,000 in assets, or in such dissolution upon payment by Winslow to SSC of a sum, when combined with any dissolution of assets, distributed to SSC, equals $150,000."

A security interest is "an interest in personal property or fixtures which secures payment or performance of an obligation." (Cal. U. Com. Code, § 1201, subd. (37)(a).) The language of the agreement between the parties unambiguously establishes that Winslow gave Saratoga a security interest in the specified stocks to secure Saratoga's recovery of $150,000 of its investment. Consequently, the agreement was a security agreement with respect to the stock. When a debtor signs a security agreement containing a description of the security and the owner-possessor of the property has received written notice of the security interest, the transfer of the security interest in the property is complete. At this point, the security interest attaches and becomes enforceable. (Cal. U. Com. Code, § 8313, subd. (1)(h); Cal. U. Com. Code, § 8321, subd. (1).) Winslow signed the security agreement and acknowledged that he was the owner-possessor of the stock. Thus, the security interest was enforceable. Since the contract between Winslow and Saratoga sufficed to transfer a security interest in the stock from Winslow to Saratoga, Winslow did not fail to comply with this term of his agreement with Saratoga.

The trial court's decree required Winslow to *convey* the stock to Saratoga. We find no such contractual term in the agreement. The agreement required security but did not provide for conveyance. Winslow agreed to *assign* the stock *as security* for the $150,000. He did not agree to *convey* the stock. The terms of the agreement did not entitle Saratoga to more than a security interest in the specified stock. An agreement to execute a security agreement for an advance of money is specifically enforceable (cf. 5A Corbin, Contracts (1964) § 1153, p. 168). Specific performance is not, however, the appropriate procedure for enforcement of a security interest.[4] Security interests in securities (i.e., stock) are subject to the collection procedures specified in division 9 of the California Uniform Commercial Code except that no filing is necessary to perfect the interest. (Cal. U. Com. Code, § 8321, subd.

---

[4]Winslow did not merely agree to execute a security agreement but actually executed a security agreement. Thus, Saratoga received the security interest to which it was entitled under the parties' agreement.

(3).) Upon default, a secured party may collect on the debt by utilizing the procedures specified in the California Uniform Commercial Code. Specific performance decrees are not among the remedies available to the secured creditor. Hence, specific performance was not proper in this case. Accordingly, the specific performance decree is reversed.

## CONCLUSION

The money judgment for Winslow is reversed and remanded. The trial court is ordered to enter judgment on Winslow's cross-complaint for RTC. The specific performance decree is reversed. The parties shall bear their own costs.

Premo, J., and Elia, J., concurred.