[No. B095859. Second Dist., Div. Seven. Mar. 19, 1998.]

RTC MORTGAGE TRUST 1994-S2, Plaintiff and Appellant, v. ROBERT D. SHLENS, Defendant and Appellant.

## COUNSEL

Pircher, Nichols & Meeks and James L. Goldman for Plaintiff and Appellant.

Baker, Silberberg & Keener, Robert C. Baker and Jeffrey P. Nolan for Defendant and Appellant.

## OPINION

**LILLIE, P. J.**—Defendant Robert D. Shlens appeals from a summary judgment granted in favor of plaintiff on its first amended complaint for judicial foreclosure of a deed of trust and for a declaration that plaintiff is entitled to a deficiency judgment against Shlens for all amounts due under the note which are left unsatisfied after foreclosure and sale of the property.[1] Plaintiff appeals from the denial of its postjudgment motion for attorney's fees and

---

[1] A judgment in favor of plaintiff was entered on June 12, 1995. Defendant filed notice of appeal on August 7, 1995. On August 18, 1995, a modified judgment for foreclosure of deed of trust on real property was entered, which contains details relating to the amounts in default under the note, directs that the property be sold by the receiver, directs disposition of the

costs under Civil Code section 1717. ▆▆▆ The principal issue on defendant's appeal is whether the trial court properly determined that as a matter of law plaintiff was entitled to a deficiency judgment against Shlens in that Shlens's state law defenses were barred under the federal common law doctrine known as the *D'Oench, Duhme* doctrine (*D'Oench, Duhme & Co.* v. *F.D.I.C.* (1942) 315 U.S. 447 [62 S.Ct. 676, 86 L.Ed. 956]), or under the doctrine's "partial codification" (*Weber* v. *New West Federal Savings & Loan Assn.* (1992) 10 Cal.App.4th 97, 99 [12 Cal.Rptr.2d 468]) in the federal statutes at 12 United States Code section 1823(e) (section 1823(e)).

## FACTUAL AND PROCEDURAL BACKGROUND

On January 22, 1988, Western Bank, as broker for Western Federal Savings & Loan Association (Western Federal), funded a $3.5 million loan to Shlens in order for Shlens to refinance a prior loan he had obtained in 1987 when he purchased real property, a 91-unit apartment complex located at 6710-40 Hayvenhurst Avenue in Van Nuys. In connection with the 1988 refinance loan, Shlens executed and delivered to Western Bank a promissory note and, to secure his obligations under the note, a multifamily deed of trust and assignment of rents; both instruments were dated January 22, 1988, although the trust deed was executed by Shlens on January 28, 1988. Neither the note nor the deed of trust contains any exculpatory language precluding a deficiency judgment against Shlens, nor was any such agreement included as a rider or attachment to the deed of trust or note. On January 22, 1988, Western Bank assigned its beneficial interest in the trust deed and note to Western Federal; the corporation assignment of deed of trust was executed by Western Bank on January 26, 1988; the trust deed and corporation assignment of deed of trust were recorded in the office of the county recorder on February 4, 1988. Soon after Western Bank's assignment to Western Federal, Western Federal reimbursed Western Bank for the funds loaned to Shlens, but Western Bank continued to service the Shlens loan until December 1992.

In June 1993, the Resolution Trust Corporation (RTC) was appointed receiver for Western Federal. On July 1, 1993, Shlens defaulted on his payments on the note. According to Shlens, since the inception of the loan in 1988, the property had steadily decreased in value as it had become "a victim of drug smuggling and gang violence," and repair costs and vacancies

proceeds of the sale, and declares that Shlens is personally liable for payment of the sums due under the note and deed of trust and a deficiency judgment may be ordered against him following further proceedings. Inasmuch as the June 12, 1995, judgment contains the same legal conclusion with respect to the issue of the deficiency judgment as the modified judgment, we deem the notice of appeal to be from the modified judgment. (See Cal. Rules of Court, rule 2(c).)

increased while rental income decreased. In 1992 and 1993, Shlens had requested a forbearance of the loan principle and engaged in negotiations with Western Bank, and then Western Federal, for a renegotiation of the note; Western Federal and then the RTC did not formally respond to his requests. In November 1993, Shlens quitclaimed the property to codefendant 6710-40 Hayvenhurst, a limited partnership, which filed for bankruptcy relief in March 1994. On March 8, 1994, RTC recorded a notice of default under the note. In August 1994, RTC, as receiver for Western Federal, assigned the note and deed of trust to plaintiff RTC Mortgage Trust 1994-S2 (hereinafter RTC Mortgage Trust). Plaintiff is a Delaware business trust, in which the RTC has a 51 percent ownership interest, and 1994-S2 Limited, a limited partnership of private investors, has a 49 percent interest.

In September 1994, the bankruptcy court granted plaintiff relief from automatic stay, and shortly thereafter RTC Mortgage Trust brought the instant action for judicial foreclosure of deed of trust and declaratory relief; the cause of action for declaratory relief sought a legal determination the plaintiff was entitled to a deficiency judgment against Shlens if amounts due under the note were left unsatisfied after a foreclosure sale. According to plaintiff, prior to commencing the action, all moneys payable under the note were due and payable; demand was made on Shlens to pay the balance due, but no part has been paid; as of January 1, 1995, the total principal and interest of about $3.8 million was due and owing on the loan; Shlens also owed about $79,000 in delinquent property taxes on the property.

According to the declaration of Mitchell Clarfield, submitted by plaintiff in support of its motion for summary judgment, Clarfield was an account officer of Carbon Mesa Advisors, Inc., the servicing agent for plaintiff; plaintiff's files for the Shlens loan contained no document executed by Western Bank or by Western Federal which purports to limit Shlens's personal liability for any obligations under the note; plaintiff obtained its files from the RTC, which in turn received the documents from Western Federal. One of the documents in plaintiff's file was a six-page "Loan Analysis & Approval Form," dated January 4, 1988, which was signed by five members of Western Federal's loan committee; there is nothing in that form which indicates that Western Bank or Western Federal had approved any sort of agreement limiting the lender's recourse in the event of default by the borrower.

J. Leo Sullivan, the major loan manager and senior vice-president of Western Federal from 1985 to 1992, declared that the "Loan Analysis & Approval Form" (Form) was used by Western Federal to document the principal terms of loans for purposes of presenting the loan and the terms to

the loan committee for its approval, and to document the committee's approval of the loan; it was Western Federal's policy that all terms of a loan, including any nonrecourse provisions, would be included in the Form, which constituted the record of the action taken by the loan committee with respect to the loan; no other document or form reflected the loan committee's approval of specific loan terms; although there were loan committee minutes, the minutes provide very little information about the loans, merely indicating the loan number, the dollar amount, and the persons present at the committee meeting. The Form for the Shlens loan indicates that Western Bank acted as the broker on the Shlens loan. The underwriting of the loan and review and approval of the loan terms would have been performed by Western Federal, not Western Bank; Western Federal's loan committee, of which he was a member, approved the Shlens loan on January 6, 1988.

According to Ben Slayton (Slayton), Western Bank's managing director, Western Federal had an agreement with Western Bank that upon Western Federal's approval, Western Bank would initially fund the loan, and then Western Federal would purchase the loan from Western Bank within 30 days; Western Bank itself did not approve the Shlens loan. Although the loan was initially funded by Western Bank, Western Federal was the bank which took the risk relating to default on the loan; it was Western Bank's practice to inform the borrower that Western Bank intended to sell the loan on the secondary market, and to inform the borrower that the purchasing bank would conduct its own analysis and approval of the loan; this process was called "prior approval."

In opposition to the motion for summary judgment, defendant contended that plaintiff was not entitled to any deficiency after foreclosure by virtue of an alleged "exculpatory agreement." According to Shlens's February 24, 1995, declaration, during the time he approached Western Bank for a loan and during the time of execution of the loan documents, he dealt only with employees of Western Bank; on or about January 28, 1988, he executed numerous documents pertaining to the loan; included among the documents was "the Exculpatory Language which was drafted by Western Bank in response to my insistence that I was only interested in refinancing under a non-recourse loan. My understanding was that this was a standard exculpatory provision executed within the banking industry."

Shlens's attorney, Jeffrey P. Nolan, stated in his February 24, 1995, declaration that earlier in February 1995, he reviewed documents produced by plaintiff and found in the loan files plaintiff obtained from the RTC an alleged exculpation agreement. Upon Western Bank's insolvency, the RTC inventoried the assets; an RTC document captioned "Investor Review File

Index" pertaining to the Shlens loan refers to a document titled "Exculpation Language."

The document titled Exculpation Language, dated January 28, 1988, refers to Western Bank's loan number for the loan to Shlens. The document states in pertinent part that "Borrower shall not be liable personally for the payment of the principal and interest on the debt payable under this Note, and the sole recourse of Lender for collection of such amounts shall be against the Property." The document was signed only by Shlens and by the vice-president of the property management firm which managed his property on Hayvenhurst Avenue, the latter signing as a witness. The escrow officer from City National Bank, apparently the escrow company for the loan, stamped the document indicating that it had been certified as a true and correct copy of the original, "which has been transmitted for recording," even though it is undisputed that the exculpation language document was not actually recorded.

The RTC loan files also contained several "loose documents," including an addendum to escrow closing instructions, dated January 21, 1988, from the Western Bank multifamily loans department to City National Bank, in which the multifamily loans department of Western Bank requested that the escrow company have executed an original, and certify two copies of, the Exculpation Language. According to an undated letter by Debra Schweiger, closing coordinator with Western Bank, she forwarded the Exculpation Language signed by Shlens, along with other loan documents, to another Western Bank employee, Richard Powers, and requested that Western Bank fund the loan on January 29, 1988. By letter dated February 5, 1988, Debra Schweiger sent to Western Federal the "Final Delivery Package for Purchase of the [Shlens] Loan," which letter contained a list of documents, and an "X" beside the ones which were part of the package being sent; the list did not include any reference to "Exculpation Language" or an exculpatory agreement, indicating that such document was not part of Western Bank's final delivery package sent to Western Federal in February 1988. Although Schweiger's letter contained a listing for an Affidavit of Personal Liability, there was no "X" beside that document, indicating that no affidavit of personal liability was part of the final delivery package.

According to Shlens's attorney, he had conversed with Slayton, the managing director of Western Bank, who told him that the exculpatory agreement was within Western Bank's files. However, according to the February 27, 1995, deposition testimony of Slayton, Slayton did not recall having any conversation with Shlens regarding the loan being a nonrecourse loan or regarding an exculpation agreement; usually the borrower would have to ask

for an exculpatory agreement. Slayton also testified that Western Bank did not approve the Shlens loan because it was contemplated that Western Federal was to purchase the loan; he had no discussions with anyone at Western Federal about the issue of the exculpation agreement. Slayton also testified that ·it was not the practice of Western Bank to record documents such as the Exculpation Language, and that none of the exculpation riders in Western Bank's files are recorded.

In its motion for summary judgment, plaintiff maintained that the Exculpation Language is unenforceable against it under the *D'Oench, Duhme* doctrine and under section 1823(e). Plaintiff also argued that Shlens's other defenses, waiver, estoppel, unclean hands, failure to mitigate damages, and the state antideficiency statute, were barred by federal law. In opposition to the motion, Shlens contended that the *D'Oench, Duhme* doctrine was not applicable because the exculpatory agreement was in writing, was drafted by Western Bank, and was included in the loan files which eventually were forwarded to the RTC, so that it was not a "side deal" or secret agreement which may mislead bank examiners as to the obligations or assets of the bank. Shlens also contended that factual issues existed with respect to the writing requirements of section 1823(e), and that triable issues existed on the issue of whether he was an "innocent borrower." In reply, plaintiff contended, inter alia, that there was no "innocent borrower" exception to section 1823(e).[2]

---

[2]In the trial court, neither plaintiff nor defendant expressly articulated any theory explaining whether the Exculpation Language would have been legally enforceable against Western Federal under California law, and on appeal, the briefs do not address this issue. We directed the parties to file letter briefs addressing this issue, as it is apparent that the trial court assumed, without deciding, that Shlens had valid state law defenses as against Western Federal and that RTC and its assignee, plaintiff, took the note and trust deed subject to those valid state law defenses. If Shlens has no valid state law defenses based on the Exculpation Language, then plaintiff would be entitled to summary judgment on that ground alone (see Code Civ. Proc., § 437c, subd. (o)(1)), and it would not be necessary to apply any federal doctrines under *D'Oench, Duhme* or section 1823(e), which would operate to repudiate valid state law defenses. Defendant's answer sheds no light on the nature of his defense with respect to an alleged exculpation agreement because the answer contains only a general denial, plus affirmative defenses of failure to state a cause of action; waiver, estoppel, and unclean hands; failure to mitigate damages; comparative fault; and the antideficiency statute, Code of Civil Procedure section 580b, dealing with purchase money mortgages. None of these defenses were interposed in opposition to the summary judgment motion below, and are not argued on appeal. We deem them to be abandoned for purposes of this appeal.

Even in the letter brief filed by Shlens, there is no discussion of the issue of whether Western Federal was a holder in due course of the note and trust deed, taking without notice of any alleged exculpation agreement. For purposes of this appeal, however, we have concluded that it is not necessary for us to resolve the issue of whether Shlens in fact has established any state law defenses to plaintiff's action. As mentioned below, Shlens has pending a cross-complaint against Western Bank and the escrow company that was involved

After hearing on the motion, the trial court took the matter under submission and then on May 8, 1995, issued a 14-page ruling granting the motion. The court concluded that as to the cause of action for judicial foreclosure, there was no triable issue of fact as to Shlens's default, and plaintiff was entitled to foreclose under the note and deed of trust. As to the cause of action for declaratory relief on the issue of a deficiency judgment, the court concluded that plaintiff was entitled to a deficiency judgment as a matter of law because the Exculpation Agreement was not enforceable against plaintiff pursuant to the *D'Oench, Duhme* doctrine and section 1823(e).[3] In pertinent part, the court concluded that (1) the exculpation agreement did not meet the execution requirement of section 1823(e)(2) because it was not executed, i.e., signed, by the lender contemporaneously with the note, whether the lender be Western Bank or Western Federal; moreover, the evidence showed that the lender was Western Federal, with Western Bank acting as broker on behalf of Western Federal; and (2) the exculpation agreement did not meet the requirement of section 1823(e)(1)(C) and (D), that the agreement be approved by the loan committee of Western Federal and that such approval be reflected in the official minutes of the committee and kept in the official records. The court also concluded that the defenses of "innocent borrower" and estoppel were not applicable under the facts in the instant case.

On June 12, 1995, judgment was entered, providing in pertinent part that plaintiff was entitled to summary judgment and was entitled to proceed against Shlens for a deficiency judgment. (See fn. 1, *ante.*) After the court granted plaintiff's motion, plaintiff filed a motion for attorney's fees and costs under Civil Code section 1717.

After the court granted the summary judgment motion, defendant filed and served a cross-complaint against City National Bank, the escrow agent in connection with the loan, and against Western Bank.[4] Shlens also conducted discovery against Western Bank. Thereafter, Shlens moved for new trial on

in his loan transaction, which action may require the trial court to address issues of Shlens's state law defenses.

[3]The trial court's ruling does not expressly address the issue of whether the Exculpation Language is enforceable under California law; i.e., whether it would have given Shlens a valid defense to the assertion of a deficiency judgment by Western Federal, and whether when RTC took over the assets of Western Federal, it took the instant note and deed of trust subject to such valid defense. The trial court's ruling only addresses the issues of whether enforcement of the alleged exculpatory agreement against the plaintiff is barred by *D'Oench, Duhme* and section 1823(e).

[4]The cross-complaint is not contained in our record on appeal. According to the brief of RTC Mortgage Trust, Shlens alleged that the escrow company and Western Bank had a duty to ensure that the exculpation agreement was properly documented and recorded, and that they breached that duty, resulting in the agreement being held unenforceable. The trial court allegedly stayed the prosecution of the cross-complaint pending resolution of this appeal.

the ground of newly discovered evidence received from Western Bank. In connection with the motion for new trial, Shlens for the first time submitted in evidence a 12-page January 12, 1988, letter to Shlens from Slayton, on behalf of "Western Bank Multifamily Loans." The letter informs Shlens that "we have approved your Loan request for the [property]," which loan was subject to and contingent upon some terms and conditions set out in the letter, and informed Shlens that the commitment would not become effective unless Shlens indicated his acceptance by executing and delivering the signed commitment letter to Western Bank on or before January 22, 1988. Upon receiving the letter, Shlens apparently made several modifications and additions, which were apparently initialed by Slayton. On January 21, 1988, Shlens signed and dated the modified letter. One of the handwritten additions stated: "Exculpatory Provision—Lender shall provide borrower a 'hold harmless' provision attached to and made a part of the note and deed of trust for the purpose of limiting the security and repayment of this loan to the property only and not the borrower. The agreement shall also include the statement that there will not be a deficiency sought against borrower in the event of a sale of the property through foreclosure." There is no evidence in our record that a copy of this letter was ever forwarded to Western Federal or was in its files when the RTC took over as receiver.

The trial court denied both parties' postjudgment motions on July 26, 1995. The minute order states that "The 'newly discovered evidence' presented by defendant is not material to the case at bar as it does not change the conclusion reached by the court in granting summary judgment for plaintiff. . . . [¶] Defendant has presented the court with a letter dated January 12, 1988 which indicates approval of the subject loan by Western Bank and contains an exculpatory provision that is apparently initialed by both Dr. Shlens and by Ben Slayton, Senior Vice President and Managing Director of Western Bank. [¶] However, this letter does not constitute minutes reflecting approval of the loan by the board of directors of the depository institution or its loan committee, as required by 12 U.S.C. section 1823(e)(3). Furthermore, there is no indication that Mr. Slayton had the authority to approve the loan in the place of the board of directors or the loan committee of Western Bank. And it seems clear that Mr. Slayton could not act on behalf of Western Federal. In addition, the letter postdates the approval of the subject loan by Western Federal's loan committee on January 6, 1988. . . . Thus, [the exculpatory agreement of January 12, 1988] could not have been approved by the loan committee on January 6, 1988. [¶] Moreover, the language contained in the exculpatory provision added to the letter of January 12, 1988 differs from that contained in the Exculpation Agreement signed by Dr. Shlens."

With respect to plaintiff's motion for attorney's fees, the court concluded: "Plaintiff has requested attorneys fees pursuant to the contract originally

entered into between Western Bank and defendant pursuant to Civil Code section 1717. Moreover, plaintiff's position in this case has been enhanced by the *D'Oench, Duhme* doctrine which entitles it for purposes of this action to step into the shoes of the RTC. That doctrine prohibits defendants from asserting natural defenses and from recovering monies against the government under the contract. Thus it is inequitable to require [defendants] to pay attorneys fees when they are barred from asserting viable defenses."

Defendant filed timely notice of appeal from the judgment. Plaintiff filed timely "notice of cross-appeal" from the order denying attorney's fees. We first discuss Shlens's appeal from the judgment.

I

APPEAL FROM THE JUDGMENT

■ "A motion for summary judgment is properly granted if the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) If summary judgment was properly granted on any ground, we must affirm regardless of whether the court's reasoning was correct." (*Jackson* v. *Ryder Truck Rental, Inc.* (1993) 16 Cal.App.4th 1830, 1836 [20 Cal.Rptr.2d 913].)

As a preliminary matter, we find without merit Shlens's contention that the summary judgment was based solely upon application of section 1823(e). Both the complaint and the summary judgment motion clearly raised the issue of the federal common law doctrine of *D'Oench, Duhme*; the trial court's ruling clearly is based on both the statute and the common law doctrine. In any event, Shlens's opening brief discusses the merits of both the statute and the common law doctrine as applied to this case, maintaining that neither the *D'Oench, Duhme* doctrine nor section 1823(e) are applicable in this instance. Under principles of appellate review, the issue of whether the *D'Oench, Duhme* doctrine bars Shlens's state law defenses is properly before us.

For the first time on appeal, Shlens also contends that the court erred in applying the statute because it does not apply retroactively to a loan transaction which took place in 1988, as prior to August 1989, section 1823(e) did not protect the RTC in its receivership capacity. Also for the first time on appeal, Shlens challenges the standing of RTC Mortgage Trust to invoke the protections of federal law, and in his reply brief he argues for the first time that pursuant to *O'Melveny & Myers* v. *FDIC* (1994) 512 U.S. 79 [114 S.Ct.

2048, 129 L.Ed.2d 67], there is no general federal common law, so there is serious doubt whether the *D'Oench, Duhme* doctrine survives independently of section 1823(e).

Shlens also contends that even if the common law doctrine or statute applies in this instance, triable issues of fact exist on the issues of whether or not he was negligent or an innocent borrower who did not lend himself to a scheme to defraud or overvalue a bank asset.

As an additional preliminary matter, we assume for purposes of this appeal and the following discussion, that the Exculpation Language provides a valid defense to a claim for a deficiency judgment against Shlens under California law. (See fn. 2, *ante.*) Assuming that Shlens has such a valid defense, we proceed to address the host of issues connected with respondent's contention that the *D'Oench, Duhme* doctrine bars such state law defense. Thereafter, we will address the issue of whether section 1823(e) bars that defense. On this appeal, we also need not discuss the January 12, 1988, letter, first brought to the trial court's attention on the motion for new trial, because Shlens does not challenge here the correctness of the trial court's ruling denying his motion for new trial. We also note that there was no evidence that the January 12, 1988, letter was ever in the hands of Western Federal, the RTC, or the plaintiff.

A. *D'Oench, Duhme Doctrine.*

"The *D'Oench, Duhme* doctrine, an equitable rule of estoppel, emanates from the United States Supreme Court decision in *D'Oench, Duhme & Co. v. F.D.I.C., supra,* 315 U.S. 447. In *D'Oench, Duhme,* the Federal Deposit Insurance Corporation (FDIC) sued on a promissory note which had been assigned to it in connection with a bank failure. In defense, the obligors alleged the bank had orally agreed it would not call the note for payment. Rejecting the defense, the Supreme Court held an obligor who 'lent himself to a scheme or arrangement' that was 'likely to . . . misle[a]d' bank examiners may not assert against the FDIC any part of an agreement that might diminish the value of his written loan obligation. (*Id.* at p. 460 [86 L.Ed. at pp. 963-964].) The Supreme Court based its ruling on a 'federal policy . . . to protect [the FDIC], . . . from misrepresentations made to induce or influence [its] action[s], including misstatements as to the genuineness or integrity of securities in the portfolios of banks which it insures or to which it makes loans.' [Citation.] Congress thereafter codified the doctrine at 12 United States Code section 1823(e)." (*Walsh v. New West Federal Savings & Loan Assn.* (1991) 234 Cal.App.3d 1539, 1543 [1 Cal.Rptr.2d 35].)

"Since its inception, courts have dramatically expanded the reach of the common law doctrine and its statutory counterpart. [Citations.] . . . The doctrine applies, for example, not only to defensive use of alleged oral promises (such as in the original *D'Oench, Duhme* case), but also to offensive use, such as fraud or breach of contract claims based upon alleged oral agreements. [Citations.] Courts hold the defense applies, moreover, even where the party asserting an oral agreement was innocent of any wrongdoing. The relevant question is not whether the oral 'agreement was itself fraudulent or whether the borrower intended to deceive banking authorities, but rather whether the borrower "lent himself to a scheme or arrangement" whereby [the] authorities were likely to be misled.' [Citation.]" (*Walsh* v. *New West Federal Savings & Loan Assn., supra*, 234 Cal.App.3d at p. 1544.)

"As the Supreme Court recently explained, a primary purpose of the doctrine 'is to allow federal and state bank examiners to rely on a bank's records in evaluating the worth of the bank's assets.' (*Langley* v. *FDIC* (1987) 484 U.S. 86, 91 [108 S.Ct. 396, 98 L.Ed.2d 340].) Such evaluations must frequently 'be made "with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." [Citation.]' [Citation.] The doctrine also seeks to 'ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure.' [Citation.] Thus, ' "[t]he doctrine encourages debtors to memorialize all agreements in writing and reflects the equitable principle that losses incurred as a result of unrecorded arrangements should not fall on deposit insurers, depositors, or creditors but rather upon the person who could have best avoided the loss." ' " (*Walsh* v. *New West Federal Savings & Loan Assn., supra*, 234 Cal.App.3d at p. 1544.)

"Assignees of the FDIC and the FSLIC enjoy the protection of the doctrine, as do so-called ' "bridge banks" '—institutions authorized by the FDIC and FSLIC to operate failed banks and savings and loans . . . ." (*Weber* v. *New West Federal Savings & Loan Assn., supra*, 10 Cal.App.4th at p. 105.) The *D'Oench, Duhme* doctrine has also been applied to bar defenses based on agreements that are in writing and in the bank's records, but are not signed by the bank: "Where only a single party has signed a document, that document itself does not establish that the non-signatory is required to perform any obligations contained in the document. Instead, it would be necessary to resort to an assessment of the non-signatory's words or acts in order to determine whether that party is so bound. . . . While such an inquiry may be permissible in the context of normal contract construction, we do not believe that *D'Oench* and section 1823(e) permit this inquiry. [¶]

. . . [¶] . . . [A]n unsigned document might mislead the banking authority. Bank examiners must reliably evaluate the worth of a bank's assets 'with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services.' [Citations.] At the least, an unsigned document makes it very difficult for bank examiners under those circumstances to determine whether the banking authority will be bound. [¶] . . . If a bank has not signed a document that purports to impose on it certain obligations, there is no clear evidence that the bank considered the obligations, much less that it prudently considered them. A bank, for example, might receive a Contractor's Consent form, see that it is signed by the contractor, and proceed to make the loan to the developer without a bank employee's ever having read the added language. While prudence is not a requirement of normal contract law and thus the bank might be bound, prudent consideration of the loan is a purpose behind the *D'Oench* doctrine and section 1823(e) and dictates that FSLIC not be bound by such conduct." (*Twin Const., Inc.* v. *Boca Raton, Inc.* (11th Cir. 1991) 925 F.2d 378, 384.)

On the other hand, " '*D'Oench, Duhme* does not bar the assertion of defenses based on a *bilateral obligation which appears in the bank's records*.' " (*Resolution Trust* v. *Midwest Fed. Sav. Bank* (9th Cir. 1993) 36 F.3d 785, 793, original italics.) It is undisputed that the Exculpation Language in this case was not executed by any bank and is not a " 'bilateral obligation which appears in the bank's records.' " (*Ibid.*)

With respect to the issue of the borrower's conduct in lending himself to a scheme or arrangement likely to mislead banking authorities, it has been held that ". . . the nature of the primary policy underlying the *D'Oench* doctrine suggests that its application does not require evidence of negligence, recklessness or bad faith on the borrower's part. The ability of banking examiners to rely on an institution's records in evaluating its fiscal soundness would seem to be unaffected by whether or not a borrower knew or had reason to know of an institution's fraud." (*Federal Sav. & Loan Ins. Corp.* v. *Gordy* (11th Cir. 1991) 928 F.2d 1558, 1567.)

As explained in *Federal Deposit Ins. Corp.* v. *Wright* (7th Cir. 1991) 942 F.2d 1089: "The Supreme Court has held that the signing of a facially unqualified note subject to an unrecorded condition is itself likely to mislead banking authorities. 'Certainly, one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme or arrangement that is likely to mislead the banking authorities, whether the condition consists of performance of a counterpromise (as in *D'Oench, Duhme*) or of the truthfulness of a warranted fact.'

[(*Langley* v. *FDIC* (1987) 484 U.S. 86, 93 [108 S.Ct. 396, 402, 98 L.Ed.2d 340, 348].)] In this case, Ms. Wright signed facially unqualified notes for $25,000 and $75,000, but asserted a side agreement with the bank that they would not be payable if the board of directors failed to approve them. Therefore, she participated in a scheme that was likely to mislead banking officials. . . . [¶] . . . Thus, the *D'Oench* doctrine is applicable even though Ms. Wright may not have intended to defraud. '[T]he *D'Oench* doctrine applies where the only element of fault on the part of the borrower was his or her failure to reduce the agreement to writing.' [Citation.]" (942 F.2d at p. 1098, fns. omitted.) As the court in *Federal Deposit Ins. Corp.* v. *Caporale* (1st Cir. 1991) 931 F.2d 1, 2 explained: "As among borrowers, thrift regulators, depositors, and creditors, the borrower is in the best position to protect himself and must therefore suffer the risk of loss if he fails to ensure that his agreement is properly recorded."

"We note that *Federal Deposit Ins. Corp.* v. *Meo* [(9th Cir. 1974) 505 F.2d 790], and *In re Longhorn Securities Litigation* [(W.D.Okla. 1983) 573 F.Supp. 278], on which appellants primarily base their good-faith argument, both preceded *Langley*. In fact, language in *Meo* reveals that its holding is based on an outdated understanding of the *D'Oench* doctrine. See *Meo*, 505 F.2d at 792 ('We disagree [with FDIC]. *D'Oench* was decided *on the very narrow ground* that an accommodation maker who executes a secret agreement may not take "advantage of an undisclosed and fraudulent arrangement which [public policy] condemns and which the maker of the note made possible." ' " (*Federal Sav. & Loan Ins. Corp.* v. *Gordy, supra*, 928 F.2d at p. 1567, fn. 14.)

■■■ In light of the foregoing authorities, we conclude that the *D'Oench, Duhme* doctrine is properly applicable to the undisputed facts of the instant case to bar Shlens's purported state law defenses based on the Exculpation Language. Moreover, application of *D'Oench, Duhme* here will further the policies underlying the doctrine. There is no evidence that either Western Federal or Western Bank ever executed any exculpatory agreement; nor is there any evidence of an oral exculpatory agreement.[5] While the document captioned Exculpation Language apparently appeared in the RTC's files

___

[5]At best, one of Western Bank's officers executed a loan commitment letter which obligated the lender to provide the borrower a "hold harmless" provision barring a deficiency judgment. As pointed out by RTC Mortgage Trust, there are numerous inconsistencies between the terms of the commitment letter and the actual loan documents, implying that the commitment letter was superseded by other subsequent documents. In any event, because the January 12, 1988, letter was not before the trial court at the time it granted plaintiff's motion, and because Shlens does not contend the trial court's ruling denying the motion for new trial was error, we have no occasion to consider this letter as part of our review of the summary judgment.

when it took over Western Federal, there is no evidence that Western Federal was even aware of that document at the time Shlens signed it, or when it purchased the loan from Western Bank. The Exculpation Language was also executed *after* the time that the note and trust deed were executed, and *after* the date that Western Bank assigned its interest in the trust deed to Western Federal. Thus, we cannot even infer on this record the existence of any conduct by Western Bank that could be construed as a consent to the proposed Exculpation Language, because the note was already executed and assigned by Western Bank to Western Federal by January 26, 1988, before the January 28, 1988, Exculpation Language. The document can thus be said to be "secret" as to Western Federal at the time it was executed. Further, the fact that Western Federal's records contained an unconditional note and trust deed indicates that the unsigned Exculpation Language was likely to mislead banking authorities upon an examination of the records in 1993. Thus, consistent with *Twin Constr., Inc.* v. *Boca Raton, Inc., supra,* 925 F.2d 785, we conclude that the RTC, and its assignee RTC Mortgage Trust, are not bound by the Exculpation Language by virtue of the *D'Oench, Duhme* doctrine.

By failing to ensure that Western Bank or Western Federal executed the Exculpation Language, and by failing to ensure that an exculpatory agreement was recorded, Shlens lent himself to an arrangement likely to mislead banking authorities. Shlens's reliance on *Meo* and the purported "innocent borrower" doctrine is misplaced. Although we agree with the *Gordy* court's analysis that *Meo* is based on an outdated and overly narrow understanding of the *D'Oench, Duhme* doctrine, we also conclude that *Meo* is distinguishable from the instant case. In *Meo,* defendant executed a promissory note payable to a bank to purchase shares of its common stock; instead of issuing the stock, the bank issued voting trust certificates, which were never seen by defendant as the certificates were held by the bank as security for the loan; defendant was not aware of the manner in which the bank executed his order. The issue in *Meo* was "whether a purchaser of bank stock, unaware that the stock order has been improperly executed, is estopped from avoiding his note to the bank for failure of consideration after the bank has collapsed and gone into receivership." (*Federal Deposit Insurance Corp.* v. *Meo* (9th Cir. 1974) 505 F.2d 790, 791.) In concluding that *D'Oench, Duhme* was not applicable, the court noted that Meo "was a bona fide purchaser-borrower; he did not enter into any scheme or secret agreement whereby the assets of the bank would be overstated; he was wholly innocent of the wrongful action of SFNB in issuing voting trust certificates instead of common stock shares; he was not negligent in failing to discover the manner in which the stock order was actually executed; and, most importantly, appellant had no knowledge whatsoever of the failure of consideration until after the bank was closed and appellee instituted this suit." (*Id.* at p. 792.)

Thus, Meo, as a bona fide purchaser of bank stock, had an entirely different relationship to the bank than did Shlens in the instant case; moreover, Shlens here is not asserting the defense of failure of consideration. For all of the foregoing reasons, we conclude that *Meo*, and other cases cited by Shlens dealing with the defenses of failure of consideration and fraud in the inducement, are inapposite. Without merit is Shlens's contention that triable issues of fact existed on the issue of whether he lent himself to an arrangement whereby banking authority was or was likely to be misled. Summary judgment was thus properly granted on the ground that the *D'Oench, Duhme* doctrine barred Shlens defenses based on the Exculpation Language.

Although raised for the first time in Shlens's reply brief, we address the issue of whether the common law *D'Oench, Duhme* doctrine is still viable after the Supreme Court's general pronouncement in *O'Melveny & Myers* v. *FDIC, supra*, 512 U.S. 79, that " 'There is no federal general common law.' " (*Id.* at p. 83 [114 S.Ct. at p. 2053, 129 L.Ed.2d at p. 73].) *O'Melveny* involved an action by the FDIC, as receiver of a failed bank, against that bank's former lawyers for California state law causes of action for legal malpractice and breach of fiduciary duty; the lawyers had represented the bank in connection with two real estate syndications; after FDIC stepped in as receiver, FDIC received demands for refunds from investors in the syndications who claimed they had been deceived; the district court granted summary judgment in favor of the lawyers on the ground that the knowledge of the bank officers acting against the bank's interest was imputed to the bank, and hence to FDIC, which stood in the shoes of the bank, so that it was estopped from pursuing its tort claims against the lawyers because of the imputed knowledge. The Ninth Circuit reversed, and the lawyers filed petition for writ of certiorari, which was granted.

The issue before the Supreme Court in *O'Melveny* was whether "in a suit by the [FDIC] as receiver of a federally insured bank, it is a federal-law or rather a state-law rule of decision which governs the tort liability of attorneys who provided services to the bank." (512 U.S. at pp. 80-81 [114 S.Ct. at p. 2051, 129 L.Ed.2d at p. 71].) In concluding that state law governs the issue, the court explained that "In answering the central question of displacement of California law, we of course would not contradict an explicit federal statutory provision. Nor would we adopt a court-made rule to supplement federal statutory regulation *that is comprehensive and detailed*; matters left unaddressed in such a scheme are presumably left subject to the disposition provided by state law. . . . [¶] . . . It is hard to avoid the conclusion that [12 U.S.C.] § 1821(d)(2)(A)(i) places the FDIC in the shoes of the insolvent S & L, to work out its claims under state law, except where some provision in the extensive framework of FIRREA [Financial Institutions Reform,

Recovery, and Enforcement Act of 1989] provides otherwise. To create additional 'federal common-law' exceptions is not to 'supplement' this scheme, but to alter it." (*Id.* at pp. 85-87 [114 S.Ct. at p. 2054, 129 L.Ed.2d at pp. 74-75].) Judicial creation of a special federal rule is "limited to situations where there is a 'significant conflict between some federal policy or interest and the use of state law.' [Citation.] Our cases uniformly require the existence of such a conflict as a precondition for recognition of a federal rule of decision. . . . What is fatal to respondent's position in the present case is that it has identified *no* significant conflict with an identifiable federal policy or interest. There is not even at stake that most generic (and lightly invoked) of alleged federal interests, the interest in uniformity. The rules of decision at issue here do not govern the primary conduct of the United States or any of its agents or contractors, but affect only the FDIC's rights and liabilities, as receiver, with respect to the primary conduct on the part of private actors that has already occurred." (*Id.* at pp. 87-88 [114 S.Ct. at p. 2055, 129 L.Ed.2d at pp. 75-76].)

*O'Melveny* did not expressly address the issue of the viability of the common law *D'Oench, Duhme* doctrine, and the legal analysis and principles discussed therein do not lead logically to the conclusion that the doctrine is no longer viable as applied to the RTC under the facts in this case. Moreover, *O'Melveny* is clearly distinguishable from the instant case because the instant case involves the right of the RTC, as receiver, to examine a failed bank's records and to repudiate under federal law certain agreements which may otherwise be enforceable against it under state law. Thus, the primary conduct at issue herein is that of the RTC.

"Congress has provided that all actions involving the RTC arise under federal law, whatever the nature of the institution the RTC has taken over. 'Notwithstanding any other provision of law, any civil action, suit, or proceedings to which the [RTC] is a party shall be deemed to arise under the laws of the United States . . . .' (§ 1441a(*l*)(1).) While section 1441a is a jurisdictional statute, it also implies that Congress intended federal law to govern actions involving the RTC." (*Resolution Trust Corp.* v. *Winslow* (1992) 9 Cal.App.4th 1799, 1807 [12 Cal.Rptr.2d 510].)

In *Winslow*, the plaintiff sued Winslow for, among other things, breach of contract and for specific performance to convey stock; Winslow cross-complained for fraud and misrepresentation, alleging oral agreements and misrepresentations; RTC asserted on appeal that the *D'Oench, Duhme* doctrine and section 1823(e) barred Winslow's claims in his cross-complaint. While the court in *Winslow* acknowledged the proposition set out in *Erie R. Co.* v. *Tompkins* (1938) 304 U.S. 64, 78 [58 S.Ct. 817, 822, 82 L.Ed. 1188,

1194] that there is no federal general common law, the court concluded it had no application to the case: "Attractive as Winslow's argument may appear, however, it has no application to this case. '[T]he absence of any specific statutory provision governing the issue does not in itself mean that federal law does not control, for if the policy of the federal statute or the implications of the federal system require a uniform rule of decision, the federal courts have paramount power to fashion such a rule. [Citations.] [¶] On the other hand, the existence of a line of federal cases establishing a rule . . . is no indication of a federal policy excluding state law.' [Citation.] [¶] While state law governs the elements of Winslow's cause of action for misrepresentation, the issue of the application of federal *D'Oench, Duhme* doctrines to this matter is governed by federal law. The federal statutory scheme, as set forth in title 12, has as its paramount concern the financial health of the nation's financial institutions and, specifically, the preservation of the federal entities which have been created to safeguard the assets of troubled institutions. These laws establish a federal policy that the responsibility of these federal entities shall not extend to agreements which are not positively reflected in a financial institution's records. This policy is supreme over state law both because it is indispensable to the achievement of the underlying federal goal of preventing a national financial collapse and because it involves, as a party, an entity created and financed by the federal government. Thus, notwithstanding *Erie*, federal statutory *and common law* is supreme in this case. A federal entity which Congress has created is involved, a strong federal policy requires the application of federal law to protect this federal entity, and Congress has expressed its desire to protect the RTC by providing that actions involving that entity shall arise under federal law." (9 Cal.App.4th at pp. 1808-1809.)

We find nothing in *O'Melveny* which is inconsistent with the foregoing language in *Winslow*. Shlens cites two lower federal court cases to support his argument that *D'Oench, Duhme* is no longer persuasive after *O'Melveny*. In *Murphy* v. *F.D.I.C.* (D.C. Cir. 1995) 61 F.3d 34 [314 App.D.C. 24], the court noted that ". . . although the opinion for the Court [in *O'Melveny*] does not specifically mention *D'Oench*, it does expressly include one of the *D'Oench*-like statutory provisions (§ 1821(d)(9)) in the list of special federal statutory rules of decision from which it infers that '[i]nclusio unius, exclusio alterius.' [Citation.] In so doing the Supreme Court, we think, necessarily decided the *D'Oench* question. To translate: the inclusion of § 1821(d)(9) in the FIRREA implies the exclusion of overlapping federal common law defenses not specifically mentioned in the statute—of which the *D'Oench* doctrine is one." (61 F.3d at p. 39.) Thus, "the Supreme Court appears to have concluded that the Congress in the FIRREA did indeed address the question previously governed by *D'Oench*. It follows that the need for a

body of federal common law under the rubric of *D'Oench* has now 'disappeared' and that the district court erred in holding that Murphy's claims are barred under *D'Oench*." (61 F.3d at p. 40.)

The *Murphy* case, and the other case cited by Shlens which addressed the *D'Oench, Duhme* doctrine after *O'Melveny* (see *DiVall Insured Income* v. *Boatmen's First Nat. Bank* (8th Cir. 1995) 69 F.3d 1398), do not discuss a point which is critical to the instant case, wherein Shlens maintains that the statutory codification of the *D'Oench, Duhme* doctrine, section 1823(e), cannot be relied upon by the RTC herein because the statute cannot be applied retroactively to the instant loan documents, executed in 1988, prior to the enactment of FIRREA (Financial Institutions Reform, Recovery, and Enforcement Act of 1989) in August 1989. The amendment of section 1823(e) in 1989 expanded section 1823(e) to cover defenses raised against the FDIC in its receivership capacity, as well as the newly created RTC in both corporate and receivership capacities. (See 12 U.S.C. § 1441a(b)(4).) If indeed Shlens is correct that section 1823(e) is *inapplicable* to the instant case, then there would be no overlap of statutory provisions and common law doctrine; rather, such a result would create an illogical "gap" in the law such that the need for the federal common law doctrine under the rubric of *D'Oench, Duhme* would not have "disappeared." In other words, the only reason why the *D'Oench, Duhme* doctrine would be unavailable to the RTC Mortgage Trust in this case would be if section 1823(e)(1) did apply herein and superseded the common law doctrine.

In order to understand the inherent incompatibility between Shlens's assertion that section 1823(e) is inapplicable to the instant case and his assertion that the *D'Oench, Duhme* doctrine is no longer viable, we set out some background on the statute.

"In 1950, eight years after the Supreme Court decided *D'Oench*, the Congress enacted the Federal Deposit Insurance Act, 12 U.S.C. § 1811 *et seq.*, which 'bars anyone from asserting against the FDIC any agreement not properly recorded in the records of the bank that would diminish the value of an asset held by the FDIC.' [Citation.] That provision, as modified in 1989 by [FIRREA], currently provides that: 'No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement— [¶] (A) is in writing, [¶] (B) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution, [¶] (C) was approved by

the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and [¶] (D) has been, continuously, from the time of its execution, an official record of the depository institution.' [(12 U.S.C. § 1823(e)(1).)]" *(Murphy v. F.D.I.C., supra,* 61 F.3d 34, 36.) "We recently held that § 1823(e)(1) is 'applicable only to cases involving a specific asset, usually a loan, which in the ordinary course of business would be recorded and approved by the bank's loan committee or board of directors' and that 'the requirements of § 1823(e) effectively limit that provision to conventional loan transactions.' [Citation.] . . . An agreement that does not involve an extension of credit would not ordinarily be submitted to the board or to a loan committee for approval. Moreover, while any agreement to make a significant loan will ordinarily meet the exacting requirements of § 1823(e), [citation], those requirements will almost never be met by an agreement between the bank and an investor, a trade creditor, or most clearly, a tort claimant . . . . Without so much as a 'hint in any of Congress' pronouncements that such individuals should be disfavored,' . . . it would be positively wanton for a court to construe the asset requirement so broadly as to destroy their otherwise valid claims." (61 F.3d at p. 37.)

"Section 1823(e) first appeared as a late amendment to the enactment of the Federal Deposit Insurance Act of 1950, a codification of the law pertaining to the FDIC. It received little public debate or comment. It is questionable whether enactment of the section reflected an intention to codify *D'Oench, Duhme*; rather, it appears that Congress intended it serve as an adjunct to the federal policy embodied in that doctrine. On its face, section 1823(e) 'codifies the positive duty of the FDIC to honor agreements between debtors and banks, and relieves the FDIC from accountability for oral agreements.' [Citations.]" *(Weber v. New West Federal Savings & Loan Assn., supra,* 10 Cal.App.4th at pp. 104-105.) " 'Thus, in the application of the statute, the borrower's conduct or participation in a scheme to deceive the insurer is not at issue. In contrast, the *D'Oench, Duhme* doctrine is a rule of equitable estoppel and, therefore, applies to *any* defense a borrower may assert in which the borrower participated in a scheme which tends to deceive the insurer. . . . [¶] . . . [T]he statute expands *D'Oench, Duhme* in that it applies to any agreement, whether or not it was "secret," and regardless of the maker's participation in a scheme. At the same time, however, the statute is *narrower* than *D'Oench, Duhme* in that it applies only to agreements, and not to other defenses the borrower might raise.' " (10 Cal.App.4th at p. 107, fn. 6.)

With respect to the issue of whether FIRREA, and in particular section 1823(e), applies to agreements executed prior to August 1989, we note that

there is a split of authority on the issue. (See *Oklahoma Radio Associates* v. *F.D.I.C.* (10th Cir. 1993) 987 F.2d 685, 696, fn. 8; see also *McAndrews* v. *New Bank of New England* (D.Mass. 1992) 796 F.Supp. 613, 615-616.) However, "[t]here appears to be a consensus among the courts that clear indications on retroactivity cannot be found in the legislative history." (*Oklahoma Radio Associates* v. *F.D.I.C., supra*, 987 F.2d at p. 696.)

For purposes of this appeal, however, we need not resolve the issue of whether or not section 1823(e) can be applied to agreements executed in 1988. If the statute does not apply, Shlens does not put forth any reason *not* to apply the common law *D'Oench, Duhme* doctrine.[6] As set out above, that

---

[6]It is one thing for Shlens to argue that section 1823(e), as amended by FIRREA, is not retroactively applicable, and another for him to claim that, assuming nonretroactivity, Congress somehow intended the enactment of FIRREA to retroactively impact the common law *D'Oench, Duhme* doctrine. No authority is cited for this proposition. In one case, holding that congressional intent favors retroactive application of the administrative claims procedures portions of FIRREA, the court noted that " '[I]f courts were to construe FIRREA so as to shield from its grasp all claims arising from contracts formed before FIRREA's enactment, Congress's efforts to protect the public from existing and anticipated bank failures would be hamstrung.' " (*Feigel* v. *F.D.I.C.* (S.D.Cal. 1996) 935 F.Supp. 1090, 1098, citing *McAndrews* v. *Fleet Bank of Massachusetts, N.A.* (1st Cir. 1993) 989 F.2d 13, 17.) Assuming FIRREA is not applicable to agreements executed before August 1989, it would also be illogical to construe FIRREA as cutting off application of the federal common law principles of *D'Oench, Duhme* to those pre-1989 agreements. To so assume, we would have to conclude that Congress created the RTC in 1989, and gave it authority to take over failed banks, yet distinguished its duties with respect to certain promissory notes depending on whether the notes were executed before or after August 1989. The legislative history is apparently silent on this issue, and Shlens fails to point to anything in the text of FIRREA itself which treats pre-1989 agreements differently than those executed after August 1989.

Because we do not need to address the merits of the issue of whether FIRREA applies to agreements executed before August 1989, we need not discuss the FDIC's February 10, 1997, "Statement of Policy Regarding Federal Common Law and Statutory Provisions Protecting FDIC, as Receiver or Corporate Liquidator, Against Unrecorded Agreements or Arrangements of a Depository Institution Prior to Receivership." The statement of policy provides guidelines for use by the FDIC in asserting section 1823(e) or the *D'Oench, Duhme* doctrine. The guidelines state that they are "discretionary and evolving by nature but nevertheless will serve to moderate the circumstances in which the FDIC will exercise these protections." Therein, the FDIC also concludes that "after careful consideration, that sections 1823(e) (as amended by FIRREA) and 1821(d)(9)(A) cannot be applied retroactively to alleged agreements or arrangements entered into before the enactment of FIRREA on August 9, 1989."

Nothing in the FDIC's statement of policy, however, intimates that the common law *D'Oench, Duhme* doctrine would be inapplicable under the facts in the instant case. The statement of policy even provides that "Before FIRREA, a borrower could assert an affirmative claim against the FDIC or FSLIC, or a defense against FDIC/Receiver or the FSLIC, based on a written agreement that failed to meet the contemporaneous-execution, approval, and recording requirements of section 1823(e), so long as the borrower had not lent himself to an arrangement or scheme likely to mislead bank examiners. *D'Oench,* 315 U.S. at 460." (FDIC, Statement of Policy Regarding Federal Common Law and Statutory Provisions Protecting FDIC, as Receiver or Corporate Liquidator, Against Unrecorded Agreements or

doctrine, when applied to the facts of the instant case, bars Shlens's defenses based on the Exculpation Language. If, however, section 1823(e) does apply to agreements executed in 1988, and *D'Oench, Duhme* is no longer viable, we would reach the same result in this case. In other words, assuming that section 1823(e) is properly applied to this case, summary judgment would have been properly granted on that ground, as we discuss below.

B. *Section 1823(e) Would Bar Shlens's Defense.*

Shlens fails to establish in his opening or reply brief any error in the court's analysis of the statutory provisions of section 1823(e)(1) as applied to the facts of this case, or that triable issues of fact exist with respect to application of the statute. We therefore conclude that the trial court properly determined that one or more of the statutory prerequisites to enforcement of the Exculpation Language is lacking. It is without dispute that the Exculpation Language was not executed by either Western Bank or Western Federal; nor was the document approved by the board of directors or loan committee of either institution. Therefore, summary judgment is not precluded because there may be a dispute as to other requirements, such as whether or not the Exculpation Language was an official record of the depository institution.

In light of the issues raised by the parties below, and in their briefs on appeal, we conclude that summary judgment was properly granted in favor of RTC Mortgage Trust. This is so because if section 1823(e) applies herein, it would bar Shlens's defense based on the Exculpation Language. If section 1823(e) does not apply, then the *D'Oench, Duhme doctrine* bars Shlens's defenses.

## II

### APPEAL OF ORDER DENYING MOTION FOR ATTORNEY'S FEES

■ RTC Mortgage Trust contends that the trial court erred in denying its motion for attorney's fees and costs under Civil Code section 1717, as both the note and trust deed contained attorney's fees provisions, and it

---

Arrangements of a Depository Institution Prior to Receivership, 62 Fed.Reg. 5985, fn. 4 (Feb. 10, 1997).)

was unquestionably the prevailing party in the action.[7] We agree. Shlens construes the denial of fees by the trial court as indicating that the trial court exercised its discretion and determined that RTC Mortgage Trust was somehow not a prevailing party within the meaning of the statute. However, Shlens's construction of the instant record is incorrect. There is no indication that the trial court concluded that RTC Mortgage Trust was not the prevailing party. In fact, the language of the court's ruling clearly implies that plaintiff was the prevailing party, yet the court nevertheless denied fees on another ground. That other ground was a perceived inequity in applying state law principles to the issue of attorney's fees when federal law barred Shlens from asserting his state law defenses. We can infer from the instant record and the trial court's ruling that, in the absence of the purported equitable principle relied upon by the trial court, the trial court would have granted RTC Mortgage Trust's motion.

The trial court erred in relying on a purported equitable principle arising because of the application of federal law to one of the other issues in this case. As explained by the court in *Resolution Trust* v. *Midwest Fed. Sav. Bank, supra,* 36 F.3d 785, even federal courts addressing the issue of attorney's fees under California Civil Code section 1717 are obligated to apply California state law. "Generally, courts adjudicating cases in which the RTC is a party apply federal law. Here, however, the district court should have applied California law in interpreting the attorney's fee provision in the contract. [Citations.] The court must apply state law in this situation unless (1) the claim for fees arose under some federal statute, [citation]; or (2) 'the litigated issues involve not basic contractual enforcement question, but issues peculiar to [federal law],' [citation]. Neither situation exists in this case. Therefore whether [the claimant] is entitled to an award of attorney's fees under the provision in the loan agreement is a question of California law." (36 F.3d at p. 800.)

Shlens contends that it is inequitable to award RTC Mortgage Trust attorney's fees because if it had been Shlens who had prevailed, he could not

---

[7]Shlens does not dispute the fact that the note obligates him to pay the attorney's fees of the holder of the note in the event of default thereunder, and the trust deed obligates him to pay attorney's fees to the assignee of the beneficiary of the trust deed in an action for foreclosure. The note provides that "In the event of any default in the payment of the note, and if the same is referred to an attorney at law for collection or any action at law or in equity is brought with respect hereto, the undersigned shall pay the holder hereof all expenses and costs, including, but not limited to, attorney's fees." The trust deed provides that "In any action brought to foreclose this deed or to enforce any right of Beneficiary or of Trustee hereunder, Trustor shall pay to Beneficiary and to Trustee attorneys' fees in a reasonable sum, to be fixed by the Court." The trust deed specifies that the term "Beneficiary" shall mean the owner and holder of any note secured by the trust deed, and that the terms of the trust deed inure to the benefit of all parties thereto, including their successors and assignees.

have recovered attorney's fees from the plaintiff because he could not recover against the federal government or the United States because the matter was not pending before the district court, which allegedly has original jurisdiction over all civil actions against the United States, and because such an award is within the exclusive jurisdiction of the court of claims. The problem with Shlens's argument is that the plaintiff is not the United States, but a Delaware business trust. As an assignee of the RTC, the plaintiff may be able to assert the *D'Oench, Duhme* doctrine and federal statutes; however, such application of law does not transform the plaintiff into the United States, or bring the United States into the case as a party. Inasmuch as neither the RTC nor the United States is a party to this action, Shlens's argument lacks merit.

We thus conclude that Shlens has failed to provide any legal authority for the principle relied upon by the trial court in denying fees. In a sense, the court penalized the RTC Mortgage Trust because it was successful in properly asserting a valid federal law doctrine barring Shlens's state law defenses. We are aware of no authority supporting the denial of attorney's fees, otherwise proper under Civil Code section 1717, because another issue in the case is governed by federal law. Further, this is not a case where the results of the litigation are "mixed," rather, this is a case where ". . . a plaintiff who obtains all relief requested on the only contract claim in the action must be regarded as the party prevailing on the contract for purposes of attorney fees under section 1717. [Citations.] [¶] . . . [¶] . . . [W]hen one party obtains a 'simple, unqualified win' on the single contract claim presented by the action, the trial court may not invoke equitable considerations unrelated to litigation success, such as the parties' behavior during settlement negotiations or discovery proceedings, except as expressly authorized by statute." (*Hsu* v. *Abbara* (1995) 9 Cal.4th 863, 876-877 [39 Cal.Rptr.2d 824, 891 P.2d 804].)

Accordingly, *Hsu* compels us to conclude that the trial court erred in denying plaintiff attorney's fees and costs under Civil Code section 1717. Because the trial court did not address the issue of the amount of attorney's fees to be awarded, the trial court will be afforded an opportunity on remand to determine the amount of fees.

### DISPOSITION

The judgment is affirmed. The order denying the motion of RTC Mortgage Trust 1994-S2 for attorney's fees and costs is reversed, and on remand the trial court is directed to determine the amount of reasonable attorney's

fees and costs to which RTC Mortgage Trust 1994-S2 is entitled. RTC Mortgage Trust 1994-S2 is entitled to costs on appeal.

Johnson, J., and Neal, J., concurred.

A petition for a rehearing was denied April 8, 1998, and the petition of appellant Robert D. Shlens for review by the Supreme Court was denied June 24, 1998.